IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| MAMIE BURTON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-09-710 |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## OPINION AND ORDER

Before the Court, upon the consent of the parties, is Plaintiff Mamie Burton's action, pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting judicial review of a final decision of the Commissioner of the Social Security Administration denying her claim for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et. seq.*, and for supplemental security income under Title XVI of the Act, 42 U.S.C. § 1381 *et. seq.* The parties filed cross Motions for Summary Judgment (Document Entry ("Dkt.") Nos. 16, 17). Plaintiff filed a response to Defendant's Motion. (Dkt. No. 18). After considering the cross motions, the response, the administrative record, and the applicable law, this Court, for the reasons set forth below, concludes that Plaintiff's Motion for Summary Judgment (Dkt. No. 16) should be **DENIED**, that Defendant's Motion for Summary Judgment (Dkt. No. 17) should be **GRANTED**, and that this action should be dismissed.

1

## I.  INTRODUCTION

Plaintiff Mamie Burton ("Burton") brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security Administration ("Commissioner") denying her application for disability insurance benefits ("DIB") and for supplemental security income ("SSI").  First, Burton maintains that substantial evidence does not support the Administrative Law Judge's ("ALJ") decision because he failed to properly consider evidence in the record that her mental impairment (depression) was a medically determinable impairment that resulted from the limiting effects of her physical impairments.  (Dkt. No. 16 at 6).  Burton proceeds to argue that, because her mental impairment "is actually a medically determinable impairment, the ALJ should have performed and documented the analysis required by [20 C.F.R. §§] 404.1520a and 416.920a(e)(2)."  (Dkt. No. 16 at 8).  On this basis, Burton maintains that the administrative decision should be remanded to "allow the ALJ to properly evaluate the limiting effects of [her] mental impairment."  (Dkt. No. 16 at 8).  Second, Burton contends that the ALJ erred by failing to recognize all of the limitations that resulted from her knee impairment in determining her residual function capacity.  (Dkt. No. 16 at 8-9).  Thus, on this ground as well, Burton moves the Court for an order reversing the Commissioner's decision and awarding benefits, or in the alternative, an order remanding her claim for further proceedings.  The Commissioner responds that substantial evidence supports the ALJ's decision, that it comports with applicable law, and that it should therefore be affirmed.

## II.  ADMINISTRATIVE PROCEEDINGS

Plaintiff Mamie Burton submitted an application for DIB and SSI benefits with the Social Security Administration ("SSA") on July 19, 2006, claiming that she had been disabled and unable

to work since July 12, 2005, principally as a result of a left knee injury and degenerative disc disease. (Tr. 117).[1]  Burton has her high school equivalent education and has past relevant work as a patient caregiver at a group home. (Tr. 118; 122).  Burton's DIB and SSI claims were denied upon initial review and also upon reconsideration. (Tr. 12, 46-51).

Burton then requested a hearing before an ALJ. (Tr. 52).  A hearing was held via video-teleconference on February 11, 2008, at which time the ALJ heard testimony from Burton. (Tr. 21-37; 56-66).  Burton was represented by counsel at the hearing. (Tr. 23).  As reflected in his written decision dated February 29, 2008, the ALJ, after considering the entire record, made the following determinations concerning Burton:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2020.

2. The claimant has not engaged in substantial gainful activity since July 12, 2005, the alleged onset date (20 CFR §§ 404.1520(b), 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: degenerative joint disease of the left knee, degenerative disc disease of the lumbar spine, hypertension, and atypical chest pain (20 CFR §§ 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR §§ 404.1567(b) and 416.967(b) except that she is limited to occasional stooping, crouching, kneeling, and crawling.

---

[1] "Tr." refers to the transcript of the administrative record.

3

6.      The claimant is unable to perform any past relevant work (20 CFR §§ 404.1565 and 416.965).

7.      The claimant was born on July 31, 1961 and was 43 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR §§ 404.1563 and 416.963).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR §§ 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because the Medical-Vocational Rules support a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR §§ 404.1560(c), 404.1566, 416.960(c) and 416.966).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from July 12, 2005 through the date of this decision (20 CFR §§ 404.1520(g) and 416.920(g)).

(Tr.12-20).  Thus, on February 29, 2008, the ALJ denied Burton's application for benefits.  (Tr. 20).  Burton, through counsel, appealed the ALJ's decision to the Appeals Council of the SSA's Office of Hearings and Appeals.  (Tr. 8).  On January 5, 200[9],[2] after considering Burton's contentions in light of the applicable regulations and evidence, the Appeals Council concluded that there was no basis upon which to grant Burton's request for review.  (Tr. 1-5).  The decision of the ALJ thereby became the final decision of the Commissioner, and it is from this final decision that the appeal (Dkt. No. 1) has been taken pursuant to 42 U.S.C. § 405(g).

---

[2] Given the sequence of the events, the Appeals Council's decision would have been rendered in January 2009, as opposed to 2008 as indicated on the decision.

4

The evidence is set forth in the transcript, pages 1 through 510.  (Dkt. No. 6).  There is no dispute as to the facts contained therein.

## III.  STATUTORY BASES FOR BENEFITS

Under the Social Security Act, DIB and SSI are separate and distinct programs.  42 U.S.C. §§ 401 *et. seq.*, 1381 *et. seq.*  Nevertheless, applicants seeking benefits under either statutory provision must prove "disability" within the meaning of the Act, which defines disability in virtually identical language for both programs.  *See* 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a).  Under both provisions, disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.  *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(3)(A).  Moreover, the law and regulations governing the determination of disability are the same for both DIB and SSI.  *See Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

## IV.  STANDARD FOR REVIEW OF ADMINISTRATIVE DETERMINATIONS

A federal court reviews the Commissioner's denial of benefits only to ascertain whether (1) the final decision is supported by substantial evidence and (2) the Commissioner used the proper legal standards to evaluate the evidence.  *Brown v. Apfel*, 192 F.3d 472, 473 (5th Cir. 1999); *see also*, 42 U.S.C. § 405(g).[3]  "Substantial evidence," as defined in the Act, means "such

---

[3] Title 42, Section 405(g) limits judicial review of the Commissioner's decision as follows: "The findings of  the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  The Act specifically grants the district court the power to enter judgment, upon the pleadings and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the case for a rehearing" when not supported by substantial evidence.

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."
*Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.*,
305 U.S. 197, 229 (1938)).   Substantial evidence is "more than a scintilla and less than a
preponderance." *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995).   If the Commissioner's
findings are adjudged to be supported by substantial evidence, then such findings are conclusive
and must be affirmed.  *Id*.  A finding of no substantial evidence is appropriate only if no credible
evidentiary choices or medical findings exist to support the decision.  *Johnson v. Bowen*, 864 F.2d
340, 343-44 (5th Cir. 1988).   A court does not re-weigh the evidence, try the issues *de novo* or
substitute its judgment for the Commissioner's, even if the evidence weighs against the
Commissioner's decision.  *Id*.  Conflicts in the evidence are for the Commissioner, not the Court,
to resolve.  *Brown*, 192 F.3d at 496.

## V.  BURDEN OF PROOF

An individual claiming entitlement to disability insurance benefits under the Act has the
burden of proving her disability.  *Johnson*, 864 F.2d at 344.  The Act defines disability as the
"inability to engage in any substantial gainful activity by reason of any medically determinable
physical or mental impairment which can be expected to result in death or which has lasted or can
be expected to last for a continuous period of not less than twelve months."   42 U.S.C.
§ 423(d)(1)(A).   The impairment must be proven through medically accepted clinical and
laboratory diagnostic techniques.  42 U.S.C. § 423(d)(3).  The impairment must be so severe as
to limit the claimant in the following manner:

> [s]he is not only unable to do [her] previous work but cannot,
> considering [her] age, education, and work experience, engage in
> any other kind of substantial gainful work which exists in the
> national economy, regardless of whether such work exists in the
> immediate area in which [s]he lives, or whether a specific job
> vacancy exists for [her], or whether [s]he would be hired if [s]he
> applied for work.

42 U.S.C. 423(d)(2)(A). The mere presence of an impairment is not enough to establish that one

is suffering from a disability. Rather, a claimant is disabled only if she is "incapable of engaging

in any substantial gainful activity." *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir.

1992)(quoting *Milan v. Bowen*, 782 F.2d 1284 (5th Cir. 1986).

The Commissioner applies a five-step sequential process to determine disability status:

1.   If the claimant is presently working, a finding of "not disabled" must be
     made;

2.   If the claimant does not have a "severe" impairment or combination of
     impairments, [s]he will not be found disabled;

3.   If the claimant has an impairment that meets or equals an impairment listed
     in Appendix 1 of the Regulations, disability is presumed and benefits are
     awarded;

4.   If the claimant is capable of performing past relevant work, a finding of
     "not disabled" must be made; and

5.   If the claimant's impairment prevents [her] from doing any other substantial
     gainful activity, taking into consideration [her] age, education, past work
     experience, and residual functional capacity, [s]he will be found disabled.

*Anthony*, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren*

*v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). Under this process, the claimant bears the burden

of proof on the first four steps of the analysis to establish that a disability exists. If successful, the

burden shifts to the Commissioner, at step five, to show that the claimant can perform other work.

7

*McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999).  Once the Commissioner demonstrates that other jobs are available, the burden shifts back to the claimant to rebut this finding.  *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990).  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.  *Leggett*, 67 F.3d at 563.

In the instant case, after considering the entire record, the ALJ determined that Burton had the following severe impairments: degenerative joint disease of the left knee, degenerative disc disease of the lumbar spine, hypertension, and atypical chest pain (20 C.F.R. §§ 404.1520(c) and 416.920(c)), but that she did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).  (Tr. 14-15).  In addition, the ALJ found that Burton, despite her impairments and limitations, retained the residual functional capacity to perform light work.[4]  (Tr. 21).  The ALJ further found that, based on her residual functional capacity, Burton was capable of performing jobs such as receptionist, cashier and packer/handpacker and, thus, was not disabled under the Act.  (Tr. 19-20).

In this appeal, the Court must determine whether substantial evidence supports the ALJ's findings.  According to Burton, substantial evidence does not support the ALJ's findings due to the following: (1) the ALJ failed to properly consider evidence in the record that her depression was a mental impairment that resulted from the limiting effects of her physical impairments (Dkt. No. 16 at 6); (2) the ALJ erred by not performing and documenting the analysis required by 20

---

[4] Light work activity "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. * * * If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limited factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

C.F.R. §§ 404.1520a and 416.920a(e)(2) for this mental impairment (depression); and (3) the ALJ

erred by failing to recognize all of the limitations that resulted from her knee impairment in

determining her residual functional capacity.  (Dkt. No. 16 at 8-9).

　　　In determining whether substantial evidence supports the ALJ's decision, the court weighs

four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating,

examining and consultative physicians on subsidiary questions of fact; (3) the subjective evidence

of pain as testified to by the plaintiff and corroborated by family and neighbors; and (4) the

plaintiff's educational background, work history, and present age.  *Wren,* 925 F.2d at 126.  Any

conflicts in the evidence are to be resolved by the ALJ, not the Court.  *See Newton v. Apfel*, 209

F.3d 448, 452 (5ᵗʰ Cir. 2000) (citing *Brown*, 192 F.3d at 496).

## V.  DISCUSSION

### A.  Objective Medical Evidence

　　　Burton's medical records, which were considered by the Commissioner and are part of the

administrative record, date back to January 17, 2005.  (Tr. 348-362).  The records reflect that,

starting on January 17, 2005, Burton went to the emergency room ("ER") with complaints of chest

pain, but tests, which included an EKG and x-rays, were normal.  An ultrasound did show that

she had gallstones and, as a result of her complaints of right upper quadrant pain that radiated to

her back (Tr. 336-346, 319-334), Burton had surgery to remove her gallbladder.  Following the

surgery, Burton returned to the ER twice, on February 23, 2005 and March 4, 2005, and each

time she complained of experiencing post-surgical pain.  Each time she was examined, prescribed

pain medication and discharged.  (Tr.  303-316, 295-301).  Less than a week later, Burton

returned to the ER again with complaints of continuing pain in her right upper quadrant, but all

the tests performed were normal.  (Tr. 288-294).  She was, however, diagnosed with gastritis, for which the doctor prescribed medication (Prilosec and Carafate), and then discharged her.  (Tr. 288-294).  Burton returned to the ER on April 2, May 1, and May 10, 2005, with complaints of boils and/or abscesses under her arms and on her right shoulder and, after being treated, she was released.  (Tr. 257-268, 269-278, 279-287).

On June 24, 2005, Burton returned to the ER with complaints of left knee pain and a mass in her left breast.  (Tr. 249, 252-256).  The ER doctor ordered x-rays of her left knee, which showed "[n]o significant radiographic abnormality" (Tr. 255), and imagining of her left breast, which reflected the mass was benign.  (Tr. 249, 252-256).

The records reflect that late in July 2005, Burton returned to the ER on two separated dates because she had complaints of knee pain.  (Tr. 237-243, 246).  Upon examination, the ER doctor found that, while Burton had a mild tenderness in her knee, she had full range of motion and no calf tenderness.  He also ordered an MRI of her knee which showed "a small tear of the posterior horn of the medial meniscus."  (Tr. 246).  The doctor prescribed medication to Burton for the pain and released her.  (*Id.*).

On or about August 17, 2005, Burton reportedly fell at work and landed on her knees.  (Tr. 226-233).  She went to the ER that same date with complaints of pain to her knees and wrist.  Upon examination, the doctor noted that, while there was some tenderness, Burton showed no signs of edema, she was able to ambulate, and she had a range of motion of both ankles and digits.  The doctor diagnosed Burton with contusions to her knees and a sprained wrist.  He gave Burton a prescription for pain medication, advised her to ice her knees, limit her activity for two to three days, and follow-up with her orthopedist.  (Tr. 231).

10

The records reflect that on August 23, 2005, Burton returned to the ER with complaints of pain in her back, neck, left knee and right wrist.  (Tr. 217-222).  Burton, who rated her pain as a "9" on a ten-point scale, was administered several pain medications (depomedrol, decadron and demerol) in the ER.  (Tr. 219).  Upon examination, the ER doctor found that she had a full range of motion in her neck, left knee and right wrist and, while she did have some tenderness to palpitation in her left knee, there was no edema.  (Tr. 220).  Burton was prescribed medication for the pain (Lortab)  and instructed to follow-up with her orthopedist.  (Tr. 222).  The records reflect that, two days later, Burton did see her orthopedist, Dr. Doty, at which time she reiterated her complaints of knee, back and neck pain following her fall on August 17, 2005.  (Tr. 379).

On August 27, 2005, Burton returned to the ER with complaints of pain from an abscess for which she was prescribed antibiotics, pain medication (Lortab), advised to apply warm compresses and then follow-up with her family doctor.  (Tr. 207-213).

On September 3, 2005, less than a week since her last visit, Burton once again returned to the ER, complaining of left knee pain.  (Tr. 199-204).  The records reflect that she reported that she had taken her last dose of Percocet that morning and that her blood pressure became elevated as a result of the pain she was experiencing. (Tr. 291).  After examining Burton, the doctor diagnosed her with knee pain and hypertension and prescribed medication to regulate her blood pressure and medication (Ultram or Tramadol, which is used for chronic pain) for the pain in her knee.  (Tr.  204).

The next day, Burton returned to the ER—notably, ambulating without assistance or any apparent difficulty—and complained of pain as a result of torn cartilage in her knee.  (Tr. 188-195).  The records reflect that she informed the ER that she had been scheduled for surgery, but

that it was cancelled due to the hurricane and that she was out of pain medication.  (Tr. 192).

Upon examination, the doctor found that there was discomfort upon palpation of the left knee, but

that neurovascularly it was intact.  (Tr. 192).  Burton was diagnosed with knee pain, advised that

she could use crutches as needed for comfort, given a prescription for the pain (Percocet) and

effects of arthritis (Voltaren), and advised to follow-up with her family doctor.  (Tr. 191, 195).

On September 10, 2005, Burton returned to the ER again with complaints of continued left

knee pain and she requested medication for the pain.  (Tr. 157).  The ER doctor examined Burton

and documented his finding as follows:

> [her] left hip is without trauma and without pain.  The left femur is without
> edema or deformity.  The left knee reveals no effusion present.  She has
> generalized tenderness everywhere in the knee area but there is no point
> tenderness or bony point tenderness specifically on the patella. . . . [T]he
> patient is diffusely tender in the medial joint line and the lateral joint line
> . . . .  She has no calf tenderness and no edema of the calf.

(*Id.*).  The doctor refilled her prescription for Percocet and advised her to follow-up with her

doctor.  (Tr. 158).

On or about September 28, 2005, Burton's doctor, Dr. Doty, performed an arthroscopic

meniscectomy of her left knee.  (Tr. 150, 378).  The records reflect that the procedure went well

and, following the surgery, Burton was provided crutches to assist her with ambulating.  (Tr.

149).  One week after the procedure, Dr. Doty examined Burton and noted that her knee was

healing well. (Tr. 327).  However, two weeks after the procedure, Burton returned to Dr. Doty

with complaints that her left knee was "popping." (Tr. 326).  Dr. Doty examined her knee and,

while finding that her knee was stable and without erythemas or effusions, he scheduled another

scope to further evaluate her complaints.  (*Id.*).  Dr. Doty also referred Burton to a physical

therapist, but there are no records which indicate that Burton attended therapy.  (Tr. 386).

Instead, approximately one week later (October 22, 2005), Burton returned to the ER with complaints of left knee pain.  (Tr. 153).  While in the ER, medical personnel administered pain medication (Toradol) to Burton to alleviate her complaints of pain.  (*Id.*).  Burton was examined and the doctor found no erythema, a good range of motion in her knee, some calf tenderness and a positive Homans sign (pain that results from venous thrombosis or inflamation of the calf muscle).  (Tr. 153).  The doctor also ordered diagnostic testing which ruled out any evidence of deep vein thrombosis.  (Tr. 154, 156).  The doctor diagnosed Burton with left leg pain, edema, and swelling status post surgery and, in addition to the pain medication she received in the ER, the doctor prescribed medications (Naprosyn and Lortab) to Burton for the pain.   (*Id.*).

Burton saw Dr. Doty on November 1, 2005, because her left knee was stiff and sore.  (Tr. 375).  Dr. Doty examined her and his notes reflect that he found soreness in her range of motion for which he prescribed a pain medicine (Naprosyn).  (Tr. 375).  Dr. Doty saw Burton again two weeks later because she continued to complain that she was experiencing pain in her left knee which she described feeling as if two bones were rubbing together.  (Tr. 374).  Upon examination, Dr. Doty noted that she had a painful range of motion.  He diagnosed her with degenerative joint disease, ordered another MRI of her lower extremity, and prescribed a different medication (Percocet) to manage her pain.  (*Id.*).  The MRI, done on November 17, 2005,  revealed that the small tear in the meniscus, which had been seen in her prior MRI, remained unchanged.  (Tr. 179-181).  Consequently, Dr. Doty performed a second arthroscopic meniscectomy of Burton's left knee in early December 2005.  (Tr. 150; *see also*, Tr. 373, 382). The operative report reflected the following:

13

> The medial joint was investigated.  There was severe chondral lesion of the
> femoral condyle.  This showed breakdown of the hyaline cartilage.  The
> posterior horn of the meniscus was intact. . . . There was loose bodies that
> were removed with the shaver.  The later joint was investigated through a
> lateral approach.  The joint was found to have radial tear of the medial side
> of the lateral meniscus.  This was shaved and removed.  The posterior
> horn, which was degenerated, was trimmed back to a healthy rim.  Excess
> debris and particles were removed.  The intercondylar notch was intact.

(Tr. 147).

Shortly after Dr. Doty performed the second arthoscopy of her left knee, Burton returned

to the ER on December 18, 2005, complaining that she had left knee pain with ambulation.  (Tr.

151-152).   The ER doctor noted that, upon examination, her knee revealed "well healed

arthroscopy surgical wounds . . . no erythema or discharge . . .  minimal edema in the knee joint

and possibly a minor effusion . . .  full range of motion with some discomfort . . .  [and] no

instability of the knee itself."  (Tr. 152).  Burton was discharged with an additional prescription

for a pain medication (Lortab), crutches and instructions to follow-up with Dr. Doty.  (Tr. 152).

On December 20, 2005, Burton returned to see Dr. Doty and complained that she was

experiencing pain in the lumbar region of her back.  (Tr. 370).  Dr. Doty's notes reflect that

Burton's knee was healing well.  Due to her complaints of back pain, Dr. Doty ordered an MRI

of her lumbar spine and prescribed medications to aid her sleep (Ambien) and for the pain

(Percocet).  (*Id.*).  An MRI, completed the next day, revealed a broad based bulge at L5-S1, but

there was no evidence of either stenosis or compression.  (Tr. 284).  Dr. Doty discussed the MRI

findings with Burton on December 29, 2005, and gave her a prescription for the pain (Lortab).

(Tr. 369).

14

Complaining of continued left knee pain, Burton returned to the ER on January 1, 2006. (Tr. 145).  The records reflect that, upon examination, there was only some mild edema, no evidence of cellulitis or effusion, inflamation, or erythema.  The notes also reflect that Burton was able to ambulate, she had 5/5 strength in both her upper and lower extremities, and she was neurologically intact.  (*Id.*).  Burton was given a Ace wrap to wrap her knee, instructed to take Tylenol and Motrin for the pain, and referred back to Dr. Doty for any further care.  (*Id.*).

On January 17, 2006, or approximately two weeks later, Burton returned to see Dr. Doty for her knee pain.  (Tr. 368).  Dr. Doty examined Burton and he noted that, while there was some soreness in the range of motion, her left knee was stable.  Dr. Doty gave Burton a prescription for the pain (Percocet) and recommended that she consider wearing a knee brace.  (*Id.*).

Burton did not see Dr. Doty again until March 6, 2006.  (Tr. 367).  During this visit she complained of sciatica and Dr. Doty prescribed medications (Lortab and Toradol) for her pain. (*Id.*).  On June 12, 2006, or approximately three months later, Burton returned to see Dr. Doty with continued complaints of sciatica and, upon examination, Dr. Doty found that Burton had decreased range of motion in her back for which he prescribed pain medication.  (Tr. 366). Approximately one month later, Dr. Doty again saw Burton and, during this visit, he diagnosed her with a herniation in her back, wrote her a prescription for a pain medicine, and referred her to another doctor.  (Tr. 365).

On July 17, 2006, less than a week after last seeing Dr. Doty, Burton was seen in the ER with complaints of pain in her left knee that she reported was "so bad [that] it radiates up into the low back and all the way to her neck."  (Tr. 143).  The doctor noted that Burton's general appearance was alert, oriented times four and "pleasant."  (Tr. 480).  Further, despite her

15

subjective complaints of pain, upon examination, the doctor found that her neck was supple and non-tender with a normal range of motion; that her back showed no significant tenderness and she had a normal range of motion; that she had 5/5 strength bilaterally in both her upper and lower extremities; and that, while there was some tenderness with palpation in the anterior of her left knee, she had a normal range of motion, no ligament laxity, no erythema of joint effusion, no leg swelling or evidence of deep vein thrombosis, and her knee was found to be neurovascularly intact. (Tr. 143-144, 480-481). The doctor diagnosed Burton with an acute exacerbation of chronic knee pain and lumbar/cervical strain and advised her to follow-up with her physician, Dr. Doty. (Tr. 144, 480-481).

Burton returned to the ER two days later (July 19, 2006) with complaints of pain on her left side, as well as concerns that her blood pressure was elevated as a result of the pain. (Tr. 167-172). In triage, Burton was given injections of Toradol and Decadron, which she indicated relieved her pain. (Tr. 167-168). Upon examination, the ER doctor noted that Burton's neck was supple, that her complaints regarding her back were that of "diffuse comfort," and that her knee showed no signs of swelling and was neurovascularly intact. (Tr. 169). The doctor diagnosed Burton with "chronic back knee neck pain," prescribed a Medrol Dosepak and Tramadol for the pain, advised her to follow-up with her regular doctor and, upon discharge, noted she was "in good condition." (Tr. 170, 172).

On August 6, 2006, Burton returned to see Dr. Doty for complaints of neck and low back pain. (Tr. 364, 412). Dr. Doty examined her and noted that she had a decreased range of motion. He diagnosed Burton with a herniation and prescribed medication to her for the pain (Lortab). (Tr. 364).

16

On August 13, 2006, Burton went to the ER complaining of back pain. The records reflect that she explained that she injured the left side of her body a year ago; that, after having an MRI, she was told that she needed back surgery; that she experiences constant pain; and she stated that she "can't cope" with the pain. (Tr. 469-478). After examining her, the ER doctor diagnosed Burton with knee pain, as well as neck/thoracic/low back pain. (Tr. 475). The doctor wrote Burton a prescription for a muscle relaxer (Robaxin), a pain medication (Ultracet), and an anti-inflammatory (Disalcid), and discharged her with the recommendation that she follow-up in a few days with her own doctor. (*Id.*).

On September 9, 2006, Burton presented in the ER complaining of pain in her right shoulder with movement due to a cyst. (Tr. 461-466). The doctor removed the cyst, applied a dressing to the area, and discharged Burton with prescriptions for both an antibiotic and a pain medication (Lortab), and instructions to apply a warm compress to the area. (Tr. 466).

The records reflect that Burton did not return to see Dr. Doty until October 26, 2006. (Tr. 411). During this visit, Burton complained of back pain. Upon examination, Dr. Doty found a decreased range of motion in her back and he prescribed medication (Percocet) to control her pain. (*Id.*). Burton returned one month later (November) because she was experiencing left knee pain and, after examining her, Dr. Doty diagnosed her with degenerative joint disease and provided her with prescriptions for the pain (Soma and Percocet). (Tr. 410). Dr. Doty saw Burton again on December 14, 2006, and his records reflect that she complained of neck pain and was observed to be in tears due to the pain. (Tr. 409). Upon examination, Dr. Doty found that there was a decreased range of motion in her neck. He diagnosed Burton with cervical disc pain and referred her to another doctor. (*Id.*).

17

On December 15, 2006, Burton went to the ER and complained that she had been experiencing right ear pain for the past four days which decreased her hearing. (Tr. 451-457). Upon examination, the ER doctor noted that Burton's right ear was mildly swollen. (Tr. 455). He also noted that her neck was supple, without meningismus or adenopathy. (Tr. 455). Burton was given drops for her ear and discharged. (Tr. 457).

On January 9, 2007, less than a month after last seeing him and despite his referral, Burton returned to Dr. Doty with complaints of pain on her left side. The records reflect that he wrote her a prescription for pain medicine (Percocet). (Tr. 408).

On February 12, 2007, Dr. Roderick Chandler ordered x-rays of Burton's left knee. (Tr. 438). The images, taken at the North Oaks Health System Radiology Department, revealed no evidence of a fracture or dislocation. In his report, the radiologist listed his "Impression" as "[m]ild joint space narrowing of the medial compartment" and "[d]egenerative spurring of the medial tibial spine." (*Id.*).

On March 6, 2007, Burton presented in the ER with complaints of left leg pain and stiffness, which she rated as a 10/10, and she explained the pain started after seeing Dr. Chandler the day before when he "injected medication into [her] knee." (Tr. 440-46). Upon examination, the ER doctor found her knee to be minimally swollen with generalized tenderness, noted that there was some edema to her lower extremity on that side, and found her range of motion to be fairly limited due to the pain. The doctor also noted there was "some muscular spasm and tenderness to the right side of her neck and her upper back [which] . . . is a mild distress secondary to pain in her knee." (Tr. 444). The doctor listed his impression as "chronic knee pain from previous injury to knee with knee surgery [and] [m]uscular soreness from improper posture

18

while walking." (*Id.*).  The doctor discharged her with instructions to take a "Mepergan Fortis soma compound [a narcotic pain reliever] and ibuprofen," to stay off her leg and use a wheelchair for the next several weeks, and to follow-up with her primary doctor.  (*Id.*).

On July 26, 2007, Burton presented at the ER complaining that, after trying to mow the yard, she began experiencing left-sided neck and shoulder pain that radiated down her arm; she explained that the pain increased with movement.  (Tr. 426-433).  Upon examination, Burton's neck was supple, she had a full range of motion, and she was grossly intact neurologically.  (Tr. 431).  The doctor also noted that, psychiatrically, she was appropriate and interactive.  (*Id.*).  Burton was diagnosed with chronic left knee pain and left trapezial neck strain.  (Tr. 431).  The doctor proscribed a muscle relaxant (Flexeril), a pain/arthritis medication (Voltaren) and refilled her prescription for pain medication (Lortab).  (Tr. 432).

Burton returned to the ER on August 28, 2007, due to complaints of right flank pain with deep breaths and rated her pain as a "9" on a 10-point scale.  (Tr. 414-424).  The medical providers at the ER ordered a CBC, which was normal, as well as a urinalysis and a CT of her kidneys, which was normal, and x-rays.  Burton was discharged from the ER with a prescription for pain medication (Lortab) and instructions to see her family doctor.  (Tr. 419).

On October 5, 2007, Burton went to the Harris County Hospital District ER[5] with complaints of hypertension and chest pain with the pain radiating down her left arm.  (Tr. 485-505).  Upon examination, the ER doctor noted that psychiatrically she was "appropriate"; her musculoskeletal, which included neck and back, was "normal" with no neck stiffness; her

---

[5] Burton's prior ER visits appear to be from a hospital in Louisiana.

sensation was found to be grossly intact; the strength throughout her extremities was 5/5 with the exception of left hip flexion which was 3-4/5; and neurologically she was "normal." (Tr. 488, 490-91). The doctor diagnosed Burton with chest pain, "unstable angina" and "possible early community-acquired PNA [pneumonia]." (Tr. 486, 488). The doctor admitted Burton for further evaluation; however, the further work-up at the hospital, which included an "EKG, cardiac enzymes, chest x-ray and flood chemistry, failed to show a cardiac event." (Tr. 494). The hospital discharged Burton with the following observations:

> [t]he patient recently moved to Houston from Louisiana and this is our first experience with the patient. We are concerned with the polypharmacy the patient is presenting to us with. We will allow her previous doctor to manage her pain medications, but we will be happy to help with hypertensive management . . .

(*Id.*). In another portion of the records, along the same lines, the doctor expressed the following opinion: "[d]rug seeking behavior [and] no reason for 'disability.' Reassessed and D/C [discharged] [patient] to COV." (Tr. 493).

On December 1, 2007, Burton returned to the Harris County Hospital District where, after examining her, the doctor diagnosed her with back, neck and knee pain. (Tr. 483-484). The doctor adjusted her medications, which included ordering the discontinuation of morphine, recommended that she consult with a physical/medical rehabilitation specialist, and advised her to return in two weeks. (Tr. 484).

The records reflect that Burton returned to Harris County Hospital District approximately two months later on February 5, 2008. (Tr. 509-510). On this date, a doctor diagnosed Burton was unspecified hypertension, knee/back/neck pain and depression. (Tr. 509). The doctor once again recommended that she consult with physical therapy and also ordered additional blood and

urine tests be done.  In addition, the doctor ordered the discontinuation of several medications, many of which Burton was taking for her pain (Tr. 510) and issued the following prescriptions: (1) a prescription for medication to treat her hypertension; (2) prescriptions, but in limited form, for pain medication; and (3) a prescription for an anti-depressant (Paxil). (Tr. 509).  The doctor instructed Burton to return in three months.  (Tr. 510).

Against this backdrop, Burton's claims that the ALJ erred by failing to find that she had a mental impairment (depression) that was a medically determinable "severe" impairment and that he further erred by failing to perform and document the analysis required by 20 C.F.R. §§ 404.1520a and 416.920a(e)(2) for this mental impairment (depression).  This Court finds that, contrary to her contentions, Burton bears the burden on this issue.  The Court further finds that substantial evidence exists in the record to support the ALJ's determination that any mental impairment that Burton claims she suffers from (depression) was not a severe impairment.  First, the medical records reflect that Burton, while frequently seeing medical providers, did not complain of depression nor was she ever diagnosed with depression and/or prescribed medication to treat it until February 5, 2008.  (Tr. 509).  At most, the records contain one isolated reference by Burton to her doctor that she "can't cope" with the pain and, in response, her doctor prescribed medication to alleviate her pain, but did not consider or treat her for depression.  (Tr. 469-478).  Further, following this visit, the records do not reflect that Burton returned for any medical care until approximately one month later and the records are devoid of any similar complaints.  (Tr. 469, 461-66).  Second, while the records do contain two instances where medical personnel observed Burton in an emotional state—for example, when she was treated for chest pain on January 17, 2005, medical personnel reported that she appeared very anxious (Tr. 351) and, on

another occasion, the records reflect that Burton was "in tears" as she discussed her complaints

of pain (Tr. 409)—when considered in the context of the numerous occasions upon which Burton

sought medical attention, these observations appear to be nothing more than isolated or sporadic

instances.  However, even considering these isolated instances where medical personnel observed

her anxious or in tears, the records do not reflect that the observations of Burton's emotional

condition warranted a referral to a mental health provider or even medication.  Third, the record

reflects that doctors considered her psychiatric state on different occasions and considered it to be

"appropriate."  (Tr. 431, 488, 490-91, 396).  Therefore, upon this record, the Court finds ample

evidence exists to conclude that this factor weighs in favor of the ALJ's determination that Burton

did not have a severe mental impairment (depression); and further finds that the ALJ did not fail

to use proper legal standards to evaluate the evidence before him.

### B.  Diagnoses and Medical Opinions

The second element considered is the diagnoses and expert opinions of treating and

examining physicians on subsidiary questions of fact.  Unless good cause is shown to the contrary,

"the opinion, diagnosis, and medical evidence of the treating physician, especially when the

consultation has been over a considerable amount of time, should be accorded considerable

weight."  *Perez v. Schweiker*, 653 F.2d 997, 1001 (5th Cir. 1981).  For the ALJ to give deference

to a medical opinion, however, the opinion must be more than conclusional and must be supported

by clinical and laboratory findings.  *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham*

*v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981).  Indeed, "[a] treating physician's opinion on the

nature and severity of a patient's impairment will be given controlling weight if it is 'well-

supported by medically acceptable clinical and laboratory diagnostic techniques and is not

22

inconsistent with … other substantial evidence.'" *Newton,* 209 F.3d at 455 (5ᵗʰ Cir. 2000)(quoting

*Martinez v. Chater,* 64 F.3d 172, 176 (5ᵗʰ Cir. 1995)).  As such, if the treating physician's opinion

is deficient in either respects, then it is not entitled to controlling weight.  The opinion of a medical

specialist is generally accorded more weight than opinions of non-specialists.  *Id.*   "'[T]he

Commissioner is free to reject the opinion of any physician when the evidence supports a contrary

conclusion.'" *Martinez,* 64 F.3d at 176 (quoting *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir.

1987)).

    Moreover, regardless of the opinions and diagnoses of medical sources, "'the ALJ has sole

responsibility for determining a claimant's disability status'" (Martinez, 64 F.3d at 176 (quoting

*Moore v. Sullivan*, 919 F.2d 901, 905 (5ᵗʰ Cir. 1990)), which includes determining an applicant's

residual functional capacity ("RFC").  20 C.F.R. § 404.1546.  RFC is based on all of the relevant

evidence in the case record, including information about the individual's symptoms and any

'medical source statements'—i.e., opinions about what the individual can still do despite his or her

impairment(s)—submitted by an individual's treating source or other acceptable medical sources."

SSR 96-8p, 1996 WL 374184 (July 2, 1996).  A claimant's RFC represents the individual's

maximum remaining ability to do sustained work activities in an ordinary work setting on a regular

and continuing basis.  20 C.F.R. § 404.1545(a)(1).  RFC does not represent the least an individual

can do despite his or her limitations or restrictions, but the most.  Further, a 'regular and

continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule.  SSR

96-8P, 1996 WL 374184 (July 2, 1996).

Burton contends that the ALJ erred in assessing her RFC because he failed to properly consider the limitations of her left knee. The Court cannot agree. Initially, the record does not contain an opinion from any of Burton's treating physicians addressing any functional limitations she might have had that were due to her left knee pain.[6]  There was, however, other evidence before the ALJ that assisted him in making his determination. In particular, the ALJ considered a medical assessment that was completed by Dr. Obi Okoye, a medical consultant (Tr. 394-397), as well as an assessment of Burton's physical residual functional capacity. (Tr. 398-405). With regard to the medical assessment, Dr. Okoye explained that he reviewed Burton's medical records and also examined her On September 23, 2006. (Tr. 394). When discussing her medical history, the records reflect that Burton told Dr. Okoye that "she has been having constant sharp aching pain on her left knee", that "it radiates down her left leg as well as up her thigh and lower back", and that she rates her pain as 10/10. (Tr. 394). Burton also told Dr. Okoye that "[s]he quit working as a result of her left knee pain." (Tr. 395). In addition, in discussing her functional status, the records reflect that Burton told Dr. Okoye that she was able to dress and feed herself; that she could stand at one time 10 minutes; that she was able to stand for one to two hours in an eight-hour period; that she was able to walk on level ground for half a block; that she was able to sit for six to seven hours; that she was able to lift weights of five pounds; that she was able to drive for 5 to 10 minutes; and that she was able to do some of her household chores. (Tr. 394). Upon examination, Dr. Okoye noted the following:

---

[6] Burton testified that Drs. Doty and Chandler both told her that she wouldn't be able to do any type of work again, but the record is devoid of any such medical statement or opinion. (Tr. 29).

SPINE AND EXTREMITIES:  Pulses are all palpable.  No edema.  No cyanosis.  No clubbing.  I did not make out any surgical scars on her left knee.  Her gait was a deliberate limp to the left.  She requires no assistive device for ambulation.  Grip strength is 5/5 both on [sic] hands.  Fine and gross manipulations are intact.

RANGE OF MOTION: Elbow flexion 150 degrees on both sides.  Forearm pronation 80 degrees on both sides.  Supination 80 degrees on both sides.  Wrist dorsiflexion is 60 degrees on both sides.  Palmarlexion is 60 degrees on both sides.  Shoulder forward elevation is 150 degrees on both sides.  Backward elevation is 40 degrees on both sides.  Abduction is 150 degrees on both sides.  Internal rotation is 80 degrees on both sides.  External rotation is 90 degrees on both sides.  External rotation is 90 degrees on both sides.  Cervical spine flexion is 50 degrees, extension 60 degrees, lateral flexion 45 degrees, and rotation is 80 degrees on both sides.  Lumbar spine flexion is 80 degrees, lateral flexion is 20 degrees on both sides, and extension is 20 degrees.  Hip flexion is 100 degrees on both sides, internal rotation is 40 degrees on both sides, external rotation is 50 degrees on both sides, abduction is 40 degrees, and extension is 30 degrees.  Knee flexion is 150 degrees on the right, deliberate to 120 on the left.  Ankle dorsiflexion is 20 degrees on both sides.  Plantarflexion is 40 degrees on both sides.  Internal rotation 30 degrees on both side[s].  External rotation [is] 20 degrees on both sides.  Straight leg raising is 85 degrees on both sides.  Supination is 90 degrees on both sides.  She laid straight back on the table.  She did not roll to the side to lie back.  She is able to walk on her heels.  She is able to walk on her toes.  She did not squat deliberately.  She was able to perform heel-to-toe.  She had no ulcerations.  She had no varicosities.

NEUROLOGICAL: She is alert and oriented to person, place, time, and situation.  Mood and affect are appropriate.  Personal hygiene is good.  She is able to understand and follow simple commands and directions.  Motor strength is 5/5 in all extremities.  Sensory exam is intact.  Cerebellar signs are all intact.  Cranial nerves are [sic] II through XII are grossly intact.  Deep tendon reflexes are all symmetrical.

(Tr. 396).  After reviewing her records and examining her, Dr. Okoye opined that Burton suffered primarily from a left knee pain, from which he opined that she exhibits "deliberate decreased range of motion on exam" and "requires no assistive device for ambulation", and hypertension. (Tr. 396-397).

In addition to Dr. Okoye's examination, another medical consultant completed an assessment of Burton's physical residual functional capacity.  (Tr. 398-405).   Based on this assessment, the medical consultant opined that Burton would be able to occasionally lift and carry up to 20 pounds, frequently lift up to 10 pounds, stand or walk 6 hours of an 8 hour work day, sit for 6 hours in an 8 hour work day, and had no limitations on her ability to push or pull.  (Tr. 399).   The medical consultant opined that she had no postural, manipulative, visual, communicative, or environmental limitations.  (Tr. 400-402).  In addition, the medical consultant opined that Burton had medically determinable physical impairment, however, he felt that her statements were only partially credible because at the consultative examination "she ambulated normally," but then exhibited a "deliberate limp to the left", her grip strength was 5/5 in both hands and her motor strength was 5/5 in all extremities, and she deliberately attempted to exhibit a "decreased range of motion on exam of the left knee."  (Tr. 403, 405).

After considering this evidence, along with all the other evidence before him (Tr. 15-19), the ALJ determined that "[Burton] has residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she is limited to occasional stooping, crouching, kneeling, and crawling."  (Tr. 15).

Burton argues the ALJ, in assessing her RFC, erred in recognizing all of the limitations resulting from her severe knee impairment.  In support of her argument, Barton points to the limitations that she maintains her doctors placed on her.  For example, she points to  September 2005, when her doctor prescribed crutches to assist her with walking after her arthroscopic meniscectomy; she points to August 2005, when her doctor advised her to "avoid prolonged standing or walking"; and she points to an ER doctor's instruction for her to stay off of her leg

and in a wheelchair for several weeks after she complained that she experienced pain following an injection into her knee. (Dkt. No. 16 at 8-9). Burton's argument—particularly when these instances are properly considered in context of the entire record—is unavailing. Moreover, there is ample evidence in the record of Burton's ability to ambulate on her own. (Tr. 145, 231, 188-195, 394-397). Thus, despite Burton's contentions to the contrary, the Court finds substantial evidence exists in the record that supports the ALJ's determination of Burton's RFC. The Court, therefore, concludes that this factor weighs in favor of the ALJ's determination.

### C.  Subjective Complaints

The third element to be weighed is the subjective evidence of pain. Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render her disabled. *Cook v. Heckler*, 750 F.2d 391, 395 (5th Cir. 1985). The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. § 423. The statute provides that allegations of pain do not constitute conclusive evidence of disability. There must be objective medical evidence showing the existence of a physical or mental impairment which could reasonably be expected to cause pain. Statements made by the individual or her physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence on the record. 42 U.S.C. § 423. "Pain constitutes a disabling condition under the SSA only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'" *Selders*, 914 F.2d at 618-19 (citing *Darrell v. Bowen*, 837 F.2d 471, 480 (5th Cir. 1988)). Pain may also constitute a non-exertional impairment which can limit the range of jobs a claimant would otherwise be able to perform. *See Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir. 1994). The Act requires this Court's findings to be deferential. The evaluation of evidence

27

concerning subjective symptoms is a task particularly within the province of the ALJ, who has had the opportunity to observe the claimant. *Hames v. Heckler*, 707 F.2d 162, 166 (5th Cir. 1983). The judge must consider a claimant's testimony and must indicate reasons for his credibility decision. *Scharlow v. Schweiker*, 655 F.2d 645, 648 (5th Cir. 1981).

At the administrative hearing, the ALJ heard Burton's own testimony about the impact her pain had on her daily activities. For example, Burton testified that "that [she] can't do anything," she can only walk so far, can only sit or stand so long, has problems focusing or concentrating (Tr. 25), is unable to drive (Tr. 24), and can't cook or handle pots and pans. (Tr. 28). She further testified that although she takes prescription drugs, they do not help with the pain (Tr. 26; 33), and that she wears a brace for her leg every day. (Tr. 26).

However, in stark contrast to Burton's testimony at the hearing concerning her subjective complaints, were entries in Burton's medical records, as well as other evidence that was before the ALJ. For example, the ALJ considered that, on September 25, 2006, Burton told the Dr. Okoye, a consultative medical examiner, that she was able to dress and feed herself, that she could stand at one time 10 minutes, that she was able to stand for one to two hours in an eight-hour period, that she was able to walk on level ground for half a block, that she was able to sit for six to seven hours, that she was able to lift weights of five pounds, that she was able to drive for 5 to 10 minutes, and that she was able to do some of her household chores. (Tr. 394). Further, notwithstanding her subjective complaints, the ALJ also considered that, upon examination, Dr. Okoye found that Burton had 5/5 motor strength in all her extremities and good range of motions in her joints/extremities. (Tr. 395-396). In fact, while Dr. Okoye concluded that Burton suffered primarily from a left knee pain, he also opined that she exhibited "deliberate decreased range of

motion on exam" and "require[d] no assistive device for ambulation." (Tr. 396-397). Thus, after substantial consideration, the ALJ determined that Burton's subjective complaints of pain were not as severe as she testified (Tr. 18), nor were they disabling. The ALJ, therefore, discounted Burton's testimony as not fully credible. Based on the administrative record, the Court finds that substantial evidence exists in the record to support the ALJ's determination and, therefore, this factor weighs in favor of the decision.

### D. Education, Work History and Age

The fourth element to be weighed is the claimant's educational background, work history and present age. A claimant will be determined to be under disability only if the claimant's physical or mental impairments are of such severity that she is not only unable to do her previous work, but cannot, considering her age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

The record shows that Burton was forty-three (43) years old when she applied for DIB and SSA, and that she had her high school equivalency certificate. (Tr. 19; 122). Her past relevant work experience was as a care giver at an adult care facility. (Tr. 118).

Burton suggests that since the ALJ failed to properly consider all of her limitations in assessing her RFC, he erred in finding that she was able to perform light work. The Court, however, concludes that substantial evidence supported the ALJ's determination regarding her RFC. Given the ALJ's review of the medical records, his reliance on the medical opinion of the physician who completed the residual functional capacity assessments based on Burton's medical records, and his credibility determination relative to Burton's testimony about her exertional and non-exertional limitations, substantial evidence supports the ALJ's conclusion that Burton was not

29

disabled within the meaning of the Act.   Thus, this factor also weighs in favor of the ALJ's decision.

<u>CONCLUSION</u>

Considering the record as a whole, this Court concludes that proper legal standards were adhered to and the Commissioner's decision is supported by substantial evidence.   Accordingly, it is the **ORDER** of this Court that the Defendant's Motion for Summary Judgment (Dkt. No. 17) is **GRANTED**, that Plaintiff's Motion for Summary Judgment (Dkt. No. 16) is **DENIED** and that this action is **DISMISSED**.

**DONE** at Galveston, Texas, this _____19th_____ day of August, 2011.

_____
John R. Froeschner
United States Magistrate Judge